# 20-608

In the

# United States Court of Appeals

## For the Second Circuit

❖

JESSICA T. BADILLA, CONSORCIA A. CASTILLO, AND ACEA M. MOSEY,
ERIE COUNTY PUBLIC ADMINISTRATOR, AS CO- ADMINISTRATORS
OF THE ESTATE OF BERNARDO G. CASTILLO, DECEASED,
JOSEPHINE R. ELBANBUENA, AND ACEA M. MOSEY, ERIE COUNTY
PUBLIC ADMINISTRATOR, AS CO-ADMINISTRATORS OF THE ESTATE
OF WILO M. ELBANUENA, MICHELLE S. MEDINA, AND ACEA M. MOSEY,
ERIE COUNTY PUBLIC ADMINISTRATOR, AS CO-ADMINISTRATORS
OF THE ESTATE OF NILO T. MEDINA, DECEASED, NELA A. PADURA,
AND ACEA M. MOSEY, ERIE COUNTY PUBLIC ADMINISTRATOR, AS CO-
ADMINISTRATORS OF THE ESTATE OF EDUARDO P. PADURA, DECEASED,

*Plaintiff-Appellant,*

– and –

INGRID S. BULOS, AND ACEA M. MOSEY, ERIE COUNTY PUBLIC
ADMINISTRATOR, AS CO-ADMINISTRATORS OF THE ESTATE OF
HENRY BELTRAN BULOS, DECEASED, ACEA M. MOSEY, ERIE COUNTY
PUBLIC ADMINISTRATOR, AS CO- ADMINISTRATORS OF THE
ESTATE OF RENE BADILLA, DECEASED,

*Plaintiffs-Appellants-Counter-Defendants,*

*(See inside cover for continuation of caption)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE
## MIDWEST AIR TRAFFIC CONTROL SERVICE, INC.,
## A KANSAS CORPORATION

GOLDBERG SEGALLA LLP
*Attorneys for Defendant-Appellee*
*Midwest Air Traffic Control Service, Inc., a Kansas Corporation*
665 Main Street. Suite 400
Buffalo, New York 14203
(716) 566-5487

———————————————

– v. –

MIDWEST AIR TRAFFIC CONTROL SERVICE, INC., A KANSAS CORPORATION,

*Defendant-Cross-Defendant-Counter-Claimant-Appellee,*

– and –

NATIONAL AIR CARGO, INC., NATIONAL AIR CARGO HOLDINGS, INC.,
A NEW YORK CORPORATION, NATIONAL AIR CARGO GROUP, INC.,
A MICHIGAN CORPORATION, INDIVIDUALLY AND DOING BUSINESS
AS NATIONAL AIRLINES, NATIONAL AIR CARGO - MIDDLE EAST FZE,

*Defendants-Cross-Claimants-Cross-Defendants-Counter-Defendants,*

– and –

TRANSAFRIK INTERNATIONAL LTD. and TRANSAFRIK CORPORATION LTD.,

*Defendants-Cross-Defendants.*

———————————————

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

Disclosure Statement Pursuant to FRAP 26.1(a) ......................................1

Jurisdictional Statement ...........................................................................1

Summary of Argument ..............................................................................2

I.  THE DISTRICT COURT CORRECTLY RULED THAT
    PLAINTIFFS' CLAIMS ARE PREEMPTED UNDER
    THE COMBATANT ACTIVITIES EXCEPTION TO
    THE FEDERAL TORT CLAIMS ACT .........................................5

    A. Under well-established precedent, federal law preempts state
       tort laws that conflict with a uniquely held federal interest ...................6

    B. The District Court correctly followed the conflict preemption
       analysis established by *Boyle* and *Saleh* ...............................................11

    C. The District Court correctly held that plaintiffs' claims against
       Midwest ATC conflict with the government's uniquely
       federal interest in preventing state interference with
       military conduct and decision-making ...................................................15

    D. The District Court correctly held that Midwest ATC was
       integrated into combatant activities over which the
       military retained command authority ....................................................17

II. THE DISTRICT COURT CORRECTLY RULED THAT,
    BECAUSE TERRAIN SEPARATION IS THE SOLE DUTY
    OF THE PILOT OPERATING UNDER VISUAL
    FLIGHT RULES, PLAINTIFFS' NEGLIGENCE
    CLAIM FAILS AS A MATTER OF LAW ...................................24

    A. The relevant facts establish that terrain separation was the
       sole and exclusive responsibility of the pilot flying
       under visual flight rules ........................................................................24

B.  The District Court correctly applied the law to the facts .....................27

    1.  There is no common law duty requiring air traffic controllers to provide terrain separation to an aircraft operating under visual flight rules ..................................29

    2.  The District Court correctly found that the Kabul ATC tower lacked resources or equipment that would alert controllers to the proximity of aircraft to specific terrain features ...........................................................................34

    3.  The controlling documents placed exclusive responsibility for terrain separation on the VFR pilot .......................................37

C.  The actions of the TKU662 pilot constitute the sole proximate cause of the accident ...........................................................40

Conclusion ...................................................................................................42

Certificate of Compliance .........................................................................43

27182200.v1

# TABLE OF AUTHORITIES

**Page**

**Cases:**

*Aiello v. Kellogg, Brown & Root Services, Inc.,*
    751 F.Supp.2d 698 (S.D.N.Y. 2011)....................................................12, 15, 23

*Baker v. United States,*
    417 F. Supp. 471 (W.D. Wash. 1975)................................................................30

*Beattie v. United States,*
    690 F. Supp. 1068 (D.D.C. 1988) ....................................................................30

*Biles v. United States,*
    848 F.2d 661 (5th Cir. 1988)...........................................................................30

*Boyle v. United Technologies Corp.,*
    487 U.S. 500 (1988) ......................................... 6, 7, 8, 10, 11, 12, 13, 14, 15, 22

*Cappello v. Duncan Aircraft Sales,*
    79 F.3d 1465 (6th Cir. 1996)...........................................................................30

*Correctional Services Corp. v. Malesko,*
    534 U.S. 61 (2001) .........................................................................................17

*Gray v. Wackenhut Services, Inc.,*
    446 Fed. App'x 352 (2d Cir. 2011)..................................................................41

*Harris v. Kellogg Brown & Root Servs.,*
    724 F.3d 458 (3d Cir. 2013)............................................ 11, 12, 15, 16, 22, 23

*In re Air Crash near Rio Grande,*
    2016 U.S. Dist. LEXIS 148178 (S.D. Fla., Oct. 24, 2016)...................30, 31, 37

*Isaacson v. Dow Chemical Co.,*
    517 F.3d 129 (2d Cir. 2008).........................................................................1, 2

*Koohi v. United States,*
    976 F.2d 1328 (9th Cir. 1992)...........................................................................8

27182698.v1

*McCue v. City of N.Y. (In re World Trade Ctr. Disaster Site Litig.),*
521 F.3d 169 (2d Cir. 2008) ..............................................................................14

*McDaniel v. United States,*
553 F. Supp. 910 (N.D. Cal. 1982) ............................................................30, 40

*Metzgar v. KBR, Inc. (In re KBR, Inc.),*
744 F.3d 326 (4th Cir. 2014)...............................................................12, 22, 23

*Norat v. Fluor Intercontinental, Inc.,*
2018 U.S. Dist. LEXIS 44041 (D.S.C. Mar. 19, 2018) ....................................12

*Redhead v. United States,*
686 F.2d 178 (3d Cir. 1982) ..............................................................................30

*Rodriguez v. Lockheed Martin Corp.,*
627 F.3d 1259 (9th Cir. 2010)............................................................................13

*Saleh v. Titan,*
580 F.3d 1 (D.C. Cir. 2009) ..................... 6, 9, 10, 11, 12, 13, 14, 15, 21, 22, 23

*Taylor v. Kellogg Brown & Root Servs.,*
2010 U.S. Dist. LEXIS 50610 (E.D. Va. 2010)................................................15

*Thurston v. United States,*
888 F. Supp. 1100 (D. Utah 1995)....................................................................30

*Wojciechowicz v. United States,*
576 F.Supp.2d 241 (D.P.R. 2008),
*aff'd* 582 F.3d 57 (1st Cir. 2009) ..........................................................28, 30, 33

## Rules, Laws and Statutes:

28 U.S.C. §§ 1346(b) ...........................................................................................5

28 U.S.C. §§ 1442(a)(1)........................................................................................1

28 U.S.C. §§ 2671-80............................................................................................5

28 U.S.C. §§ 2680(j) .........................................................................................6, 11

27182698.v1

## Disclosure Statement Pursuant to FRAP 26.1(a)

Defendant-appellee Midwest Air Traffic Control Service, Inc., is a Kansas corporation that has no parent corporation. There is no publicly-held corporation that owns 10% or more of its stock.

## Jurisdictional Statement

By report and recommendation of Hon. Jeremiah J. McCarthy, United States Magistrate Judge, dated October 23, 2014 (Docket **71**), the District Court found that defendant-appellee Midwest Air Traffic Control Service, Inc. ("Midwest ATC"), had satisfied each element establishing federal officer jurisdiction pursuant to 28 U.S.C. § 1442(a)(1), consistent with this Court's decision in *Isaacson v. Dow Chemical Co.*, 517 F.3d 129 (2d Cir. 2008), and other relevant case law. Plaintiffs' motion to remand this action to New York Supreme Court was thereby denied. No objection to the report and recommendation was filed.

In their brief, plaintiffs state that the applicability of § 1442(a)(1) "is contested" (Appellants' Brief, page 1). They further include "remand back to New York State Court" among their requests for relief (Appellants' Brief, page 45). However, they do not identify jurisdiction among the issues for review on this appeal. Nor do they make argument for remand in the body of their brief.

The District Court correctly found that each element required to establish federal officer jurisdiction was met. Midwest ATC is a person within the meaning of the statute who acted under a federal officer, and whose actions were performed pursuant to a federal officer's direct orders and comprehensive regulations. The "acting under" element is interpreted broadly, and "the statute as a whole must be liberally construed." *Isaacson*, *supra*, 517 F.3d at 136.

The decision denying remand also found that Midwest ATC asserted a "colorable" federal defense, thereby establishing the final element required to prove jurisdiction. This finding was further borne out by the District Court's summary judgment decision, which found Midwest ATC's federal defense to be not only colorable, but dispositive.

For these reasons, federal court jurisdiction is proper, and plaintiffs' unsupported suggestion that remand is appropriate should be given no weight on this appeal.

## Summary of Argument

The District Court granted summary judgment to Midwest ATC on two discrete bases, either one of which was sufficient to dispose of this case in its favor. Both were correctly decided.

On the evening of October 12, 2010, a cargo aircraft piloted and staffed by the plaintiffs' decedents crashed into a mountain east of the airport at Kabul, Afghanistan, following a short flight from Bagram Air Base. (Docket **155-5**, paragraph 24). In the minutes prior to the crash, the aircraft, designated as flight TKU662, was in communication with air traffic controllers at Kabul airport and was receiving sequencing instructions in preparation for landing. (Docket **155-19**, page 46, lines 6-25). At all relevant times, the aircraft was being piloted under visual flight rules (VFR), which place exclusive responsibility for separation from terrain and from other aircraft upon the pilot. (Docket **155-23**, page 76, lines 3-15; page 117, lines 8-12; page 147, lines 20-24).

Midwest ATC performed air traffic control service at Kabul International Airport pursuant to a subcontract with Readiness Management Service which, in turn, was party to a prime contract with U.S. Navy SPAWAR for the provision of air traffic control services in Southwest Asia. The prime contract expressly designated Midwest ATC as the approved air traffic control subcontractor. (Docket **155-28**, bates page MATSCI 00002).

The contract documents designated Midwest ATC personnel as "mission essential personnel" providing "mission critical capabilities supporting joint services military personnel, host nation military and coalition forces" in support of Operation Enduring Freedom in the United States Air Force Central Command

3

area of responsibility in Afghanistan. (Docket **155-28**, bates page MATSCI 00016).

On the evening of the crash, Midwest ATC manned positions in the Kabul International Airport control tower. The tower controllers worked under the command authority of, and took instruction from, a United States Air Force senior air traffic control officer (SATCO) and his deputy. (Docket **155-13**, page 56, line 20 to page 57, line 25).

At no time during the flight of TKU662 did the pilot or crew advise air traffic control that the aircraft was experiencing any equipment deficiencies, that the pilot did not understand a clearance or instruction provided by air traffic control, or that the pilot or aircraft lacked the ability to fulfill VFR obligations. (Docket **155-19**, page 48, line 24 to page 49, line 4).

The tower controller, consistent with VFR practices, did not assign a heading, vector or altitude to the flight, as those were the pilot's exclusive prerogative. (Docket **155-19**, page 49, line 13 to page 50, line 7; page 55, lines 18-25). There was no equipment or resource available to the controller that would have advised him of TKU662's proximity to any specific terrain feature. The radar presentation in the tower was solely a spatial aid, providing the controller with information about the relative positions of aircraft to one another. (Docket **155-13**, page 31, line 18 to page 32, line 14; page 83, lines 13-24).

Plaintiffs claim negligence on the part of Midwest ATC, arguing that the controller failed to ensure TKU662's separation from terrain. However, since there can be no negligence in the absence of a legal duty, the District Court correctly granted summary judgment to Midwest ATC.

Furthermore, since Midwest ATC was providing mission essential support to the United States combat mission in Afghanistan, and was doing so under the direction and control of United States Air Force officers, the District Court correctly found that plaintiffs' claims are preempted under the combatant activities exception to the Federal Tort Claims Act.

The District Court's decision and order should be affirmed.

## I. THE DISTRICT COURT CORRECTLY RULED THAT PLAINTIFFS' CLAIMS ARE PREEMPTED UNDER THE COMBATANT ACTIVITIES EXCEPTION TO THE FEDERAL TORT CLAIMS ACT.

The Federal Tort Claims Act ("FTCA") waives the United States Government's sovereign immunity for state tort claims arising out of the wrongful acts of its employees. *See* 28 U.S.C. §§ 1346(b), 2671-80. However, recognizing that state tort principles are unsuitable when assessing military conduct and decision-making during wartime, Congress preserved the government's sovereign

immunity for "any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war."  28 U.S.C. § 2680(j).

Following the conflict preemption analysis established by the United States Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) and refined by the D.C. Circuit in *Saleh v. Titan*, 580 F.3d 1 (D.C. Cir. 2009), the District Court held that plaintiffs' state tort claims against Midwest ATC conflict with the federal policies embodied in the combatant activities exception, and are therefore preempted by federal law.  (Docket **170**, pages 9 to 19).

Because the District Court correctly applied the facts to the prevailing law, its grant of summary judgment was proper.

## A.      Under well-established precedent, federal law preempts state tort laws that conflict with a uniquely held federal interest.

The District Court's analysis of Midwest ATC's preemption defense was grounded in well-established precedent.  In *Boyle*, the United States Supreme Court recognized that there are "uniquely federal interests" that are "so committed by the Constitution and laws of the United States to federal control" that federal law preempts and replaces any state tort law that might otherwise apply.  *Id*. at 504.  In *Boyle*, the plaintiff's decedent was a Marine helicopter co-pilot who drowned when he was unable to escape from a submerged aircraft because the escape hatch opened outward instead of inward.  *Id*. at 503.  The plaintiff brought product

liability claims against the government contractor who built the helicopter (and escape hatch) according to specifications that were approved by the United States. *Id*. at 512. Applying conflict preemption principles, the court held that the plaintiff's claims were preempted because they conflicted with the government's exclusive interest in the procurement of military equipment. *Id*. at 504-513.

The court's analysis established a blueprint for applying conflict preemption principles in the context of government contractor liability. First, the court must identify whether the claims against the contractor implicate a "uniquely federal interest." *Id*. at 504-506. In *Boyle*, the court found that the imposition of civil liability on private contractors who procure military equipment for the government is a uniquely federal interest because it "directly affect[s] the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected." *Id*. at 505-507.

Because a uniquely federal interest is a "necessary, not a sufficient, condition for the displacement of state law," the second step is to analyze the degree of conflict between the federal interest and the applicable state law. *Id*. at 507. Displacement only occurs when a "significant conflict" exists between the federal interest and the operation of state tort law or when the application of state tort law would "frustrate specific objectives of federal legislation." *Id*. The court

in *Boyle* identified a significant conflict between state tort law and FTCA's discretionary function exception, which embodies the federal policy of avoiding "second-guessing" the government's discretionary judgments, such as the appropriate design for military equipment. *Id.* at 511.

The third and final step is to limit the scope of state law displacement to ensure that preemption only occurs where the application of state law claims would frustrate the federal interest at issue. *Id*. at 512. The court in *Boyle* limited the scope of displacement by fashioning what is now known as the government contractor defense, which provides that state design defect claims are preempted when (1) the government approves reasonably precise specifications; (2) the contractor complies with those specifications; and (3) the contractor warned the government about any potential dangers in using the equipment. *Id*.

Given the government's ever-increasing reliance on military contractors, and its unique interest in regulating military engagements, courts have naturally invoked the combatant activities exception to preempt state tort claims against military contractors. Five years after *Boyle*, the Ninth Circuit held that the combatant activities exception preempted product liability claims against military contractors who designed an allegedly defective missile defense system involved in an accidental shoot-down of a passenger plane. *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992). The Court reasoned that "one purpose of the combatant

activities exception is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." *Id.* at 1337. Because imposing state law would have conflicted with that policy, preemption was appropriate. *Id.*

Then came *Saleh*, the seminal case on the combatant activities exception, in which Iraqi nationals alleged that they were abused by government contractors who provided translation and interrogation services at a military prison during the war in Iraq. 580 F.3d at 2-3. In holding that the plaintiffs' claims were preempted, the D.C. Circuit honed in on the federal interest promoted by the combatant activities exception and narrowly tailored a scope of displacement test to ensure that preemption under the exception only occurs when the claims genuinely implicate military prerogatives. *Id.* at 4-9.

Following a careful review of the combatant activities exception, the court found that the federal interest it embodies is "the elimination of tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit." *Id.* at 7. The court reasoned that "all of the traditional rationales for tort law—deterrence of risk-taking behavior, compensation of victims, and punishment of tortfeasors—are singularly out of place in combat situations." *Id.* The combatant activity exception thus allows the

military to operate freely without the "doubts and uncertainty inherent in potential subjection to civil suit." *Id*. The court further recognized that "the policies of the combatant activities exception are equally implicated whether the alleged tortfeasor is a soldier or a contractor engaging in combatant activities at the behest of the military and under the military's control," since cases against military contractors "are really indirect challenges to the actions of the U.S. military." *Id*.

Importantly, the court also observed that the combatant activities exception broadly applies to "any claim arising out of the combatant activities of the military," and thus commands a broad preemption akin to field preemption:

> In the context of the combatant activities exception, the relevant question is not so much whether the substance of the federal duty is inconsistent with a hypothetical duty imposed by the state or foreign sovereign. Rather, it is the imposition per se of the state or foreign tort law that conflicts with the FTCA's policy of eliminating tort concepts from the battlefield. The very purposes of tort law are in conflict with the pursuit of warfare. Thus, the instant case presents us with a more general conflict preemption, to coin a term, "battle-field preemption": the federal government occupies the field when it comes to warfare, and its interest in combat is always "precisely contrary" to the imposition of a non-federal tort duty. *Id*. at 7 (quoting *Boyle*, 487 U.S. at 500).

Having found that the plaintiffs' claims conflicted with the federal interest embodied in the combatant activities exception, the court "carefully tailored" the scope of displacement "so as to coincide with the bounds of the federal interest being protected." *Id*. at 8. Under *Saleh*, "[d]uring wartime, where a private service

contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." *Id.* at 9.

As the Third Circuit has recognized, Saleh's command authority test "is well-tailored to the purpose underlying § 2680(j): The first prong—whether the contractor is integrated into the military's combatant activities—ensures that preemption occurs only when battlefield decisions are at issue. And the second prong—whether the contractor's actions were the result of the military's retention of command authority—properly differentiates between the need to insulate the military's battlefield decisions from state regulation and the permissible regulation of harm resulting solely from contractors' actions." *Harris v. Kellogg Brown & Root Servs.*, 724 F.3d 458, 481 (3d Cir. 2013).

**B.** **The District Court correctly followed the conflict preemption analysis established by *Boyle* and *Saleh*.**

With the dissenting opinion in *Saleh* as their only legal "support," plaintiffs urge the Court to reject the preemption framework and command authority test established by *Boyle* and *Saleh*, respectively. To do so would require this Court to depart from the precedent of its sister circuits and stand alone against the weight of authority.

Contrary to plaintiffs' claim that there is a "substantial conflict in authorities" on whether *Boyle* should be "expanded" to the combatant activities exception (Appellants' Brief, page 17), courts have widely embraced the preemption analysis and command authority test. *See*, e.g. *Harris*, *supra*, at 481 ("We adopt the D.C. Circuit's combatant-activities, command-authority test because it best suits the purpose of § 2680(j)"); *Metzgar v. KBR, Inc. (In re KBR, Inc.)*, 744 F.3d 326, 351 (4th Cir. 2014) ("Due to the closer fit between the *Saleh* test and the interest at play in this case, we adopt the *Saleh* test here"); *Norat v. Fluor Intercontinental, Inc.*, 2018 U.S. Dist. LEXIS 44041, at *38-43 (D.S.C. Mar. 19, 2018) (applying *Boyle* and *Saleh* to claims against a military contractor providing electrical support services in Afghanistan); *Aiello v. Kellogg, Brown & Root Services, Inc.*, 751 F.Supp.2d 698 (S.D.N.Y. 2011) (applying *Boyle* and *Saleh* to claims against a military contractor that designed, operated, and maintained toilet facilities on a military base in Iraq).

Although plaintiffs claim uncertainty in the law, they have not cited a single case in their brief wherein a court faced with a preemption defense based on the combatant activities exception declined to follow the precedent set by *Boyle* and *Saleh*. As the District Court observed, the Third, Fourth, Ninth, and D.C. Circuits have each applied the reasoning of *Boyle* to the combatant activities exception. (Docket **170**, page 12). Both circuit courts that have examined the issue post-*Saleh*

have expressly adopted the command authority test.  *See Harris*, *supra*; *Metzgar, supra*.

Despite the strong precedent to the contrary, and none in support of their position, plaintiffs claim that neither *Boyle* nor *Saleh* should apply because, in their view, Congress has expressed a desire to exclude military contractors from the protections of the combatant activities exception by excluding them from the scope of the FTCA.  (Appellants' Brief, pages 15-17).  That argument is no different from the one expressly rejected by the Supreme Court in *Boyle*.  *Boyle*, *supra*, at 504 ("Petitioner's broadest contention is that, in the absence of legislation specifically immunizing Government contractors from liability for design defects, there is no basis for judicial recognition of such a defense.  We disagree.").  Moreover, it fails to appreciate that the sovereign immunity retained by the government through the FTCA's exceptions and federal preemption of state tort law are two entirely distinct legal concepts.  As the District Court correctly observed, "Midwest ATC is not seeking a grant of sovereign immunity under the FTCA, but rather is relying on the doctrine of preemption."  (Docket **170**, pages 14-15, quoting *Rodriguez v. Lockheed Martin Corp.*, 627 F.3d 1259, 1265 (9th Cir. 2010) ("[a]lthough the source of the government contractor defense is the United States' sovereign immunity…the government contractor defense does not confer sovereign immunity on contractors.")).

Plaintiffs' claim that the District Court's holding "expanded" the preemptive scope of *Boyle* also misses the point. (Appellants' Brief, page 15). As this Court has correctly recognized, *Boyle* was "not narrowly about duties imposed by contract," but "more broadly about federal policies and interests and the exercise of federal discretion, in the face of contrary state law." *McCue v. City of N.Y. (In re World Trade Ctr. Disaster Site Litig.)*, 521 F.3d 169, 194 (2d Cir. 2008) (concluding that the state tort claims of plaintiffs who sustained respiratory injuries during the clean-up of the World Trade Center after September 11, 2001 could be preempted under a provision of the Stafford Act that immunizes the government from liability for discretionary acts while engaged in disaster relief efforts). Thus, preemption can occur whenever state claims would intrude on prominent federal interests, not just in the narrow context of a procurement contract.

Finally, plaintiffs contend that "the District Court's analysis would have the practical effect of providing broad immunity, via a preemption analysis, for *any* government contractor, regardless of whether or not the contractor's alleged negligence coincided with a specific military purpose." (Appellants' Brief, page 27). Plainly, nothing about that argument rings true. *Saleh*'s command authority test is specifically designed to avoid the "broad immunity" plaintiffs caution against, requiring preemption only when "battlefield decisions are at issue" and

only when the contractor's activities were under the command authority of the military.  *See Harris*, *supra*, at 481.

The District Court properly relied on *Boyle* and *Saleh*, and plaintiffs have offered no persuasive reason why this Court should not follow the same precedent.

**C.**     **The District Court correctly held that plaintiffs' claims against Midwest ATC conflict with the government's uniquely federal interest in preventing state interference with military conduct and decision-making.**

Because plaintiffs renounce *Boyle*'s preemption framework altogether, they have not disputed many of the key findings that persuaded the District Court to find that plaintiffs' claims are preempted.

Plaintiffs do not dispute that their claims against Midwest ATC implicate a uniquely federal interest.  There can be no reasonable disagreement on this point, since "there is no question that the activities of private contractors, acting under the supervision of the military in a war zone, fall within an area of uniquely federal interest."  *See Aiello*, *supra*, at 709 (quoting *Taylor v. Kellogg Brown & Root Servs.*, 2010 U.S. Dist. LEXIS 50610, *26 (E.D. Va. 2010); *see also Saleh*, *supra*, at 11 (noting that "the Constitution specifically commits the Nation's war powers to the federal government, and as a result, the states have traditionally played no role in warfare.").

Nor do plaintiffs dispute that imposing state tort law on Midwest ATC would significantly conflict with the federal interest embodied in the combatant activities exception. On this point, the District Court correctly observed that the broad field preemption that flows from the federal interest embodied in the combatant activities exception – eliminating tort from the battlefield – "suggests that any non-federal substantive negligence law will cause 'significant conflict' with that interest." (Docket **170**, page 15, quoting *Aiello*, *supra*, at 710).

Without specifically disputing the presence of a significant conflict, plaintiffs point out that, in *Harris*, the Third Circuit disagreed that the federal interest embodied in the combatant activities exception was as broad as "eliminating tort from the battlefield." (Appellants' Brief, page 25). The court instead characterized the relevant federal interest as "foreclos[ing] state regulation of the military's battlefield conduct and decisions" (despite the minor disagreement, the court went on to adopt *Saleh*'s command authority test in whole). *Harris*, *supra*, at 480. However, as the District Court properly observed, plaintiffs' claims against Midwest ATC present a significant conflict even absent broad preemption, since "the core of plaintiffs' claim – that Midwest ATC failed to provide terrain separation services to flight TKU 662 – at least partially implicates the military's decision to not equip the KAIA air traffic control tower with

resources to provide that service or to adopt guidelines that made terrain separation the responsibility of the controllers." (Docket **170**, page 16).

In other words, as a direct result of military prerogatives and discretion, Midwest ATC could not do the "*very thing that is the subject of the claim*." (Appellants' Brief, page 20, quoting *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001)) (emphasis original in the brief). Plaintiffs simply cannot challenge the controller's actions without questioning the adequacy of the equipment provided to him by the military and the standards and operating procedures with which the controller was bound to comply—all of which were implemented and enforced by the U.S. military after a balancing of technical, military, and social considerations during a time of war.

Accordingly, the District Court correctly found that plaintiffs' tort claims significantly conflict with the federal interests embodied in the combatant activities exception.

**D.  The District Court correctly held that Midwest ATC was integrated into combatant activities over which the military retained command authority.**

The facts overwhelmingly support the District Court's conclusion that Midwest ATC was integrated into combatant activities over which the military retained command authority.

The primary purpose of Midwest ATC's employment at KAIA was to provide "mission critical capabilities" supporting joint services military personnel in support of Operation Enduring Freedom in the United States Air Force Central Command area of responsibility in Afghanistan. (Docket **155-28**, bates page MATCSI 00016). Midwest ATC's services were deemed an "essential contract service" and, therefore, contractor personnel were designated as "mission essential personnel" in accordance with Department of Defense Instruction 3020.37. (Docket **155-28**, bates page MATCSI 00016).

Midwest ATC employees provided their services in and around an active battleground. Milad Hazrati, an Afghan national who was employed as an air traffic controller at KAIA from 2010 to 2014, testified that KAIA came under insurgent attack on at least a monthly basis during the time he worked there. (Docket **155-10**, page 25, line 25 to page 26, line 14).

The importance of Midwest ATC's services to the military mission was underscored by the testimony of the U.S. military officers who oversaw the control tower in which Midwest ATC provided its services. Lieutenant Colonel Gregory Adams, the SATCO (Senior Air Traffic Control Officer) at the time of the accident, testified that the safe and efficient operation of Kabul tower was central to the United States and coalition mission. (Docket **155-13**, page 52, lines 16-19). Senior Master Sergeant Scott Stevenson, chief controller of Kabul tower and

Deputy SATCO, described the Kabul Airport as a "pivotal hub" in the U.S. and NATO combat mission and civilian nation-building in Afghanistan. (Docket **155-14**, page 16, lines 2-12). He testified that one of the "prime missions" was "the movement of troops and the movement of provisions and supplies for troops at various places in the field throughout Afghanistan." (Docket **155-14**, page 16, lines 13-19). A substantial percentage of the flights controlled by Midwest ATC were military flights engaged in combat operations and supporting active combat missions through the movement of troops and military supplies. (Docket **155-13**, page 51, line 23 to line 15; Docket **155-14**, page 16, line 20 to page 17, line 3).

Not only were Midwest ATC employees melded into the military's mission to control a "pivotal hub" in an active war zone, they operated at all times under the military's express command authority. Sgt. Stevenson confirmed that the SATCO and the Deputy SATCO retained complete "operational control" of the tower. (Docket **155-14**, page 29, lines 22-24, "[t]he direction was coming from us"; page 30, lines 1-14). Lt. Col. Adams testified that Sgt. Stevenson, as Deputy SATCO, was in a position of command authority over the Midwest ATC personnel at all relevant times, including the time of the accident. (Docket **155-13**, page 57, lines 7-11).

Those who worked in the control tower concurred that the U.S. military was in complete operational control. As Midwest ATC Vice President Parry Campbell

put it, "all of our personnel were worker bees for the SATCO and Chief Controller (Deputy SATCO)." (Docket **155-8**, page 51, lines 19-24). The SATCO was on site on a daily basis, directed where Midwest ATC employees lived, authored the manuals that guided the performance of their duties, and determined staffing levels, scheduling, and rotations for their working shifts. (Docket **155-44**, pages 3-4, paragraph 10). The SATCO also directed that all Midwest ATC personnel working in Kabul tower reside on base, just like active duty US and NATO forces. (Docket **155-44**, page 3, paragraph 10). Midwest ATC employees understood that they were to "salute smartly" to the Chief Controller and SATCO in charge. (Docket **155-8**, page 97, lines 17-24).

If there were ever a doubt, an email exchange between Captain Jeffrey Kipp (the SATCO immediately preceding Lt. Col. Adams) and Mr. Campbell just one month prior to the incident made the military's authority over the operations at the control tower crystal clear. In an email to Mr. Campbell dated September 6, 2010, Captain Kipp expressed frustration that Midwest ATC employees had, at times, approached the senior-most Midwest ATC employee about operational issues relevant to the control tower. Captain Kipp made plain that if Midwest ATC had any issues that were operationally related "ALL of those issues should be directly pointed at myself or SMSgt Stevenson." (Docket **155-9**, bates page MATCSI 00475). He closed the email with a command to Mr. Campbell to "Please advise

all ATC tower controllers..."ALL operational issues WILL BE DIRECTED to/through myself or SMSgt Stevenson."  (Docket **155-9**, bates page MATCSI 00476) (emphasis in original).

Plaintiffs do not dispute, and therefore concede, that the military retained command authority over Midwest ATC's employees.  Indeed, the military's unquestionable control over Midwest ATC's activities satisfies the second prong of the "command authority" test, which focuses on "the chain of command and the degree of integration that, in fact, existed between the military and both contractors' employees."  *Saleh*, *supra*, at 4.  Midwest ATC's employees were soldiers in all but name.

Plaintiffs focus their argument on the first prong of the command authority test, urging the court to find that, because the controller was directing two civilian flights at the time of the incident, Midwest ATC's activities do not qualify as combatant activities.  However, as the District Court correctly observed, that argument "ignores the plain wording of the *Saleh* test, which focuses on the activities of the military by broadly requiring the contractor to be 'integrated into combatant activities,' rather than more narrowly requiring the contractor to be conducting combatant activities."  (Docket **170**, page 17).

The District Court's finding that Midwest ATC was integrated into combatant activities is supported by the case law.  "Combatant activities" has been

defined broadly to "include not only physical violence, but activities both necessary to and in direct connection with actual hostilities." *Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948). Using that broad definition, the Fourth Circuit in *Metzgar* held that "[p]erforming waste management and water treatment functions to aid military personnel in a combat area is undoubtedly 'necessary to and in direct connection with actual hostilities.'" *Metzgar*, *supra*, at 351 (quoting *Johnson*, supra, at 770). Similarly, in *Harris*, the Third Circuit held that the "maintenance of electrical systems at a barracks in an active war zone qualifies as integration into the military's combatant activities." *Harris*, *supra*, at 481.

The District Court was particularly guided by *Aiello*, *supra*, a case decided by the Southern District of New York. There, the plaintiff was injured when he slipped and fell in a latrine facility located within Camp Shield, a military forward operating base in Iraq. *Id*. at 701. He brought negligence claims against the contractor responsible for the design, operation, and maintenance of toilet facilities located on the base, which was subject to multiple incidents of mortar and rocket attacks near the time of the plaintiff's injury. *Id*. at 700-701, 713. Following *Boyle* and *Saleh*, the Court held that the design, operation, and maintenance of basic life-support facilities at a base which came under hostile fire constituted "active logistical support of combat operations, both necessary to and in direct connection

with actual combat," and therefore activities to which the combatant activities exception applied. *Id.* at 712-13.

Like the services provided by the contractors in *Aiello*, *Metzgar*, and *Harris*, the air traffic control services provided by Midwest ATC at Kabul were active logistical support for the military's mission in Afghanistan, both necessary to and in direct connection with actual combat. Midwest ATC personnel provided vital military services in the heart of an active war zone, and, as affirmed by the military officers who oversaw and directed them, the services they provided were of utmost importance to the wartime mission. Because Midwest ATC employees were fully integrated into the military's combatant activities, and serving as the military's "worker bees" at a pivotal hub of the military mission, it is wholly irrelevant that they were not providing direct services to military aircraft at the exact time of the incident. Their continuous logistical support of the military's operations clearly satisfies the first prong of *Saleh*'s command authority test.

Because Midwest ATC was integrated into combatant activities over which the military retained command authority, plaintiffs' tort claims against Midwest ATC are really indirect challenges to the actions of the United States military, and those claims undoubtedly conflict with the government's interest in avoiding such challenges. Accordingly, the Court properly held that plaintiffs' tort claims are preempted under the combatant activities exception.

The grant of summary judgment to Midwest ATC should be affirmed.

## II. THE DISTRICT COURT CORRECTLY RULED THAT, BECAUSE TERRAIN SEPARATION IS THE SOLE DUTY OF THE PILOT OPERATING UNDER VISUAL FLIGHT RULES, PLAINTIFFS' NEGLIGENCE CLAIM FAILS AS A MATTER OF LAW.

### A. The relevant facts establish that terrain separation was the sole and exclusive responsibility of the pilot flying under visual flight rules.

In their complaint against several named defendants, plaintiffs alleged that the crash of flight TKU662 was caused by the negligence of then-defendants Transafrik and National Air Cargo, who provided the crew with an aircraft that was not safe or airworthy, in that it was equipped with inoperative terrain avoidance warning system and traffic collision avoidance system, among other equipment discrepancies. (Docket **155-5**, paragraph 12). The complaint further alleged that defendant Midwest ATC failed to provide necessary instruction to flight TKU662 to keep a safe and proper separation from surrounding terrain. (Docket **155-5**, paragraph 33). As against Midwest ATC, plaintiffs alleged a duty that does not exist under the facts or the applicable law.

At all times from departure to crash, TKU662 was operating under visual flight rules (VFR), even when in communication with air traffic control. (Docket **155-23**, page 76, lines 3-15). All fact witnesses, and plaintiffs' own air traffic

control expert, concurred that visual flight rules place sole and exclusive responsibility to maintain the aircraft's separation from terrain upon the pilot. (Docket **155-23**, page 117, lines 8-12; page 147, lines 20-24; Docket **155-10**, page 27, lines 10-25; page 33, lines 11-25; Docket **155-12**, page 13, lines 16-25; Docket **155-13**, page 53, line 23 to page 54, line 12; page 56, lines 2-7; Docket **155-14**, page 58, lines 9-20; Docket **155-17**, page 13, lines 3-25; Docket **155-19**, page 22, line 16 to page 23, line 5; page 40, lines 2-17).

The regulations governing aviation in and around Kabul at the time of the crash (the "controlling documents") expressly excluded terrain separation as a duty owed by air traffic control to VFR flights. "The objectives of air traffic control service as prescribed in Annex 11 do not include prevention of collision with terrain. The procedures prescribed in this document do not relieve pilots of their responsibility to ensure that any clearances issued by air traffic control units are safe in this respect." (Docket **155-39**, section 5.9, page 5-40, Note 3). "All civilian VFR flights must adhere to the published air route corridors in order to segregate from military activity. Compliance with these procedures does not relieve pilots of own responsibility to see and avoid other aircraft and for maintaining own terrain/obstacle clearance at all times." (Docket **155-36**, section 2.2, page MATSCI 000892).

There were no resources or equipment available to alert the Kabul tower controllers of the proximity of an aircraft to any specific terrain feature. (Docket **155-10**, page 69, line 7 to page 70, line 9; Docket **155-13**, page 83, lines 13-24; page 86, lines 19-24; Docket **155-14**, page 59, lines 12-16; Docket **155-19**, page 28, lines 3-12; Docket **155-23**, page 117, lines 8-25). The Kabul tower was equipped with a radar "presentation" used by the local controller for the purpose of sequencing arriving and departing aircraft, "a visual aid so they had some better awareness of where the aircraft were." (Docket **155-13**, page 31, line 18 to page 32, line 14).

Absent some expression by the pilot that he was having difficulty upholding his VFR duties, air traffic controllers had no reason to assume that he could not see and avoid terrain. (Docket **155-13**, page 82, line 23 to page 83, line 12; Docket **155-14**, page 59, lines 17-22).

At no time during the course of flight TKU662 from Bagram Air Base to Kabul did the pilot advise air traffic control that he was having difficulty understanding clearances communicated to him or upholding his VFR duty to see and avoid terrain. (Docket **155-14**, page 60, lines 3-9; Docket **155-19**, page 47, lines 11-14; page 48, line 24 to page 49, line 4; page 51, lines 19-23; page 60, lines 9-11; Docket **155-23**, page 49, lines 5-12; page 121, line 18 to page 122, line 2). This was true even though the pilot knew that he was operating an aircraft that

lacked operative terrain avoidance warning system. (Docket **155-17**, page 33, line 21 to page 34, line 4; page 39, line 8 to page 40, line 4; page 67, line 2 to page 68, line 1; Docket **155-23**, page 121, line 18 to page 122, line 2).

As TKU662 approached Kabul to land, its arrival closely coincided with an incoming civilian passenger aircraft. To accommodate safe arrival sequencing, the local tower controller asked the TKU662 pilot if he could continue his downwind leg (that is, continue parallel to the runway in the opposite direction from approach). (Docket **155-19**, page 46, lines 6-25). The pilot confirmed his ability to do so, and expressed no difficulty or impediment in carrying out his VFR duties. (Docket **155-19**, page 47, lines 6-21; page 48, line 11 to page 49, line 4). The controller did not assign a specific heading or altitude to the pilot, allowing him to continue in accordance with visual flight rules. (Docket **155-19**, page 49, line 13 to page 50, line 7; page 55, lines 18-25). The pilot acknowledged he could see the aircraft that he was to follow in to the approach runway. (Docket **155-19**, page 58, lines 5-18). The crash occurred within seconds of the final communication between the pilot and the tower. (Docket **155-19**, page 59, lines 12-18).

## B.  The District Court correctly applied the law to the facts.

The District Court correctly concluded that Midwest ATC owed no duty of care to flight TKU662 for terrain separation. (Docket **170**, page 29). This conclusion was supported by three key findings.

First, the Court recognized that visual flight rules (VFR), under which TKU662 was at all times operating, place exclusive responsibility for terrain avoidance upon the pilot-in-command. "Avoiding terrain is the VFR pilot's continuing responsibility and that responsibility cannot be delegated in whole or in part to air traffic control, regardless of whether or not the pilot is in communication with an air traffic control facility." *Wojciechowicz v. United States*, 576 F.Supp.2d 241, 253 (D.P.R. 2008), *aff'd* 582 F.3d 57 (1st Cir. 2009). The Court expressly found no legal support for plaintiffs' argument that the controller assumes a duty for terrain separation merely by giving the VFR pilot an instruction. (Docket **170**, page 27).

Second, the Court evaluated whether the Midwest ATC controller in communication with TKU662 was aware that the flight was in such proximity to a terrain obstruction that a safety alert should have been issued. Finding that the tower controller "had no resources available to him in the air traffic control tower that would alert him to the proximity of aircraft to terrain features" (Docket **170**, page 5, citing Docket **155-2**, paragraph 21), the Court concluded that the Midwest ATC controller did not possess such information or awareness that would give rise to an obligation to communicate a safety alert. (Docket **170**, page 28).

Third, the Court found that the controlling documents by which aviation was conducted in and around the Kabul International Airport expressly defined ATC

duties relative to VFR flights consistent with the legal standards set forth in the applicable case law. ICAO 4444, Procedures for Air Navigation Services – Air Traffic Management, states that "[t]he objectives of the air traffic control service as prescribed in Annex 11 do not include prevention of collision with terrain. The procedures prescribed in this document do not relieve pilots of their responsibility to ensure that any clearances issued by air traffic control units are safe in this respect." (Docket **170**, page 22, citing Docket **155-39**, page 106). In addition, the applicable Aeronautical Information Publication provides that "[u]ltimate responsibility for … terrain avoidance rests with the pilot." (Docket **170**, page 22, citing Docket **155-36**, page 87).

Plaintiffs' brief criticizes the District Court for "overemphasiz[ing] general principles for pilots operating under VFR and a strict reading of the controlling documents in effect at KAIA." Appellants' Brief, at page 35. In fact, the Court merely applied the relevant law to the facts of the case, thereby reaching the correct conclusion. Each of the bases for the Court's decision is separately discussed hereafter.

**1. There is no common law duty requiring air traffic controllers to provide terrain separation to an aircraft operating under visual flight rules.**

The common law as applied to VFR flight places the sole and exclusive responsibility for terrain avoidance upon the pilot-in-command.

"The case law is incontrovertible that an aircraft operating pursuant to visual flight rules must provide its own navigation and clearance from obstructions. The duty to operate the aircraft, and to navigate, is assigned to the pilot who must provide his own separation from obstructions, and other aircraft, while in VFR conditions." *In re Air Crash near Rio Grande*, 2016 U.S. Dist. LEXIS 148178, *18 (S.D. Fla., Oct. 24, 2016) (*citing Baker v. United States*, 417 F. Supp. 471, 484 (W.D. Wash. 1975). An air traffic controller has "no duty to warn VFR pilots of the presence of terrain or obstacles when the pilot is expected to remain in visual conditions and see and avoid terrain and obstacles." *Id*. at *21.

Courts have consistently declined to extend liability to air traffic controllers in cases where VFR pilots have failed to maintain their own separation from surrounding terrain. *See*, e.g. *In re Air Crash near Rio Grande*, *supra*; *Wojciechowicz*, *supra*; *Cappello v. Duncan Aircraft Sales*, 79 F.3d 1465 (6th Cir. 1996); *Thurston v. United States*, 888 F. Supp. 1100 (D. Utah 1995); *Beattie v. United States*, 690 F. Supp. 1068 (D.D.C. 1988); *Biles v. United States*, 848 F.2d 661 (5th Cir. 1988); *Redhead v. United States*, 686 F.2d 178 (3d Cir. 1982); *McDaniel v. United States*, 553 F. Supp. 910 (N.D. Cal. 1982); *Baker v. United States*, 417 F. Supp. 471 (W.D. Wash. 1975).

The several cases cited by plaintiffs in support of the claim that the duties of pilots and air traffic controllers are "concurrent" simply do not involve flights

operating at all times under visual flight rules. Where, as in the instant matter, the flight is operating VFR, the pilot "has the duty to operate his aircraft, to navigate the aircraft, and to provide his own separation from obstructions." *McDaniel*, *supra*, at 916. The VFR pilot "had no right, and could not reasonably expect, to rely on 'outside input' from the ATC to provide his separation from terrain." *Id*.

*In re Air Crash near Rio Grande*, *supra*, clearly defines the duties and responsibilities of VFR pilots and the air traffic controllers with whom they are in communication. On December 3, 2008, a Rockwell International Turbo Commander 690B crashed into a mountain while *en route* to land at the Luis Munoz Airport in San Juan, Puerto Rico, killing the pilot and both passengers. *Id* at *6. The entire flight was operated under visual flight rules. The survivors of the three individuals who perished in the crash brought a negligence lawsuit against United States, alleging that the Federal Aviation Administration, responsible for air traffic control services in the airspace, was negligent. *Id*.

As in the present case, the plaintiffs' allegations against the air traffic controllers revolved around the radio communications between the VFR pilot and air traffic control. *Id*. at *12. Specifically, plaintiffs alleged, among other things, that the controller provided negligent instructions to the VFR pilot and negligently failed to issue the pilot a safety alert that it was approaching terrain. In a well-reasoned decision, the Court rejected plaintiffs' claims and held that, as a matter of

law, the sole proximate cause of the crash was the pilot's failure to fulfill his VFR duties.  *Id*. at *13.

In the instant action, plaintiffs' air traffic control expert, Julia Harvey, admitted repeatedly at deposition that TKU662 was operating under visual flight rules at all times, and that the rules, and the controlling documents, place terrain separation responsibility solely on the pilot.

"Q.     And can you be any more descriptive of what characterized visual flight rules?

A.     So visual flight rules is that the pilot is responsible for his navigation and his separation against obstacles and terrain.

Q.     Is there any place in any of the controlling documents that places the responsibility for the pilot's separation from terrain on anyone other than the pilot?

A.     Not specifically, no."  (Docket **155-23**, page 43, lines 5-14).

…

"Q.     And the VFR pilot is ultimately and solely responsible for his separation from terrain, correct?

A.     In accordance with the VFR, yes."  (Docket **155-23,** page 47, lines 10-13).

…

"Q.    And at all times it needs to be VFR, however.  He has the sole and exclusive responsibility to separate himself from terrain, correct?

A.    Correct."  (Docket **155-23,** page 117, lines 8-12).

…

"Q.    And those responsibilities include, as a VFR pilot, the sole and exclusive responsibility to keep himself separated from terrain, correct?

A.    Correct."  (Docket **155-23,** page 147, lines 20-24).

Ms. Harvey had ample opportunity to present a different definition of visual flight rules, if such a definition were supportable.  She was, on this point, unwavering.  She did not claim a "concurrent" terrain separation duty shared by ATC and the VFR pilot, as plaintiffs do in their brief.  Plaintiffs' claim of concurrent duty is expressly undermined by their own air traffic control expert.

The District Court found plaintiffs' reliance on piloting expert, Colin Sommer, to be unpersuasive.  (Docket **170**, pages 26-29).  Mr. Sommer, who is not an air traffic control expert, claimed that, by giving an instruction to a VFR flight, the air traffic controller took control of the aircraft and assumed a "concurrent" duty of terrain separation.  The District Court found no factual or legal support for Mr. Sommer's opinion, and correctly afforded it no weight.  "Absent from the common law duty of reasonable care or controlling documentation – the two considerations dictating whether a duty exists (citing *Wojciechowicz*, *supra*, at

33

2727) - is any support for the principle that an air traffic controller assumes a duty for terrain separation of a flight operating under VFR by giving an instruction." (Docket **170**, page 27).

> **2.** **The District Court correctly found that the Kabul ATC tower lacked resources or equipment that would alert controllers to the proximity of aircraft to specific terrain features.**

Plaintiffs' negligence claim asserts a duty that Midwest ATC could not fulfill, given the resources that the United States elected to allocate to Kabul tower. The controllers' principal responsibility was to sequence incoming and outgoing flights to and from the landing strip. It was *not* the controllers' responsibility to instruct VFR pilots of their proximity to the ubiquitous mountain peaks that surround Kabul. Nor were controllers given tower resources allowing them to visualize such proximity. The District Court made its finding accordingly. (Docket **170**, page 5).

Furthermore, at no time during the flight did the pilot advise the local controller that he was having any difficulty understanding clearances communicated to him or upholding his VFR duty to see and avoid terrain. (Docket **155-14**, page 60, lines 3-9; Docket **155-19**, page 47, lines 11-14; page 48, line 24 to page 49, line 4; page 51, lines 19-23; page 60, lines 9-11; Docket **155-23**, page 49, lines 5-12; page 121, line 18 to page 122, line 2).

The subject crash did not occur at the site of a lone, obscure mountain peak that was known to air traffic controllers but somehow unknown to the pilots flying in and out of the Afghan capital. Kabul resides within a "bowl" of mountains, ubiquitous and obvious, in all directions. Pilot Mike Terrell provided the following testimony:

"Q.     As a VFR pilot, if you're told to or asked if you are able to extend your downwind and follow in another aircraft, and you're doing that in the dark, how do you manage to accomplish that?

A.     Not easy. I've been in that spot there in Kabul you know. But myself, I could – like if you're coming in, as we often were in the dark on a high downwind and the runway's down here, and you're going to do this, I just know enough about how far I am from the airport, and I can see my distance from the airport quite clearly on my GPS, to know how high the mountains are around me. Because it's a bowl, and you sort of go up in all directions to about 14-, 15,000 feet in some cases. And, you know, I study maps a lot, and I knew what I would – what I would be safe at." (Docket **155-17,** page 63, line 21 to page 64, line 13).

On questioning from plaintiffs' counsel, Mr. Terrell made the relative roles of VFR pilot and air traffic controller crystal clear:

"Q.    As far as air traffic control and flying visual flight rules, would you agree with me that air traffic control can serve as a tool or an aid for a pilot flying VFR?

A.    They're not supposed to.  It's not their mandate to tell you how to navigate.  Their authority is just to advise you of traffic in the pattern, shall we say, and let you know that you are now number one to land or something like that.  It's not their mandate to tell you how to fly."  (Docket **155-17,** page 88, lines 13-23).

The District Court took appropriate notice both of the reality of flight in and around the mountainous Kabul region, and the limited resources allocated by the United States to the Kabul tower as part of its military objectives.  "Mr. Smith had a radar presentation available to him that was used as a visual aid for purposes of sequencing, but not as a control aid.  He had no resources available to him in the air traffic control tower that would alert him to the proximity of aircraft to terrain features."  (Docket **170**, page 5).  "It is undisputed that the air traffic tower radar presentation did not display the altitude of TKU662 and Mr. Smith did not assign an altitude to TKU662."  (Docket **170**, page 7).

The District Court further recognized that a heightened duty to issue a terrain alert may arise if a controller is *actually aware* that an aircraft is in unsafe proximity to terrain (Docket **170**, page 23), but concluded that "there is no evidence in the record that Mr. Smith, who lacked any terrain warning equipment

and did not have a visual on the aircraft, was aware that TKU662 was in unsafe proximity to terrain." (Docket **170**, page 28, citing *In re Air Crash near Rio Grande*, *supra*, wherein no duty existed where the air traffic controller's "radar scope did not depict terrain contours or topographic features… or elevations" and did "not provide information about an aircraft's altitude above terrain"). Accordingly, the District Court concluded, as a matter of law, that Midwest ATC owed no duty of care to TKU662 for terrain separation. (Docket **170**, page 29).

> ### 3.   The controlling documents placed exclusive responsibility for terrain separation on the VFR pilot.

The controlling documents that set forth the responsibilities of pilots and air traffic controllers operating in the relevant airspace at the time of the crash did not place a duty on Midwest ATC to provide terrain separation services to VFR aircraft.

There is no dispute in the record as to which documents and regulations controlled aviation operations in and around Kabul at the time of the accident. Plaintiffs' air traffic control expert, Julia Harvey, included in her expert report a hierarchy of rules and regulations that governed the actions of Midwest ATC controllers at KAIA during the relevant time. She concluded that if a relevant procedure or regulation was not located in the documents circulated by the senior air traffic control officer, the local operating procedures, or the standard operating

procedures, the Afghanistan Aeronautical Information Publication ("Afghanistan AIP") was controlling. If the Afghanistan AIP was silent on the procedure, the International Civil Aviation Organization ("ICAO") standards for Air Traffic Management procedures applied. (Docket **155-22**, section 10.5, pages 13-14).

Here, the local and standard operating procedures expressly adopted the Afghanistan AIP and ICAO Document 4444, Air Traffic Management (ICAO 4444) regarding air traffic services. (Docket **155-33**, page MATSCI 00444; Docket **155-34**, page MATSCI 00462). Under both publications, the responsibility for terrain separation falls solely on the VFR pilot.

Specifically, the Afghanistan AIP provides: "Ultimate responsibility for aircraft and terrain avoidance rests with the pilot in command." (Docket **155-36**, page GEN 3.3-2, section 3.1.5.3). The Afghanistan AIP further provides that "All civilian VFR flights must adhere to the published air route corridors in order to segregate from military activity. Compliance with these procedures does not relieve pilots of own responsibility to see and avoid other aircraft and for maintaining own safe terrain/obstacle clearance at all times." (Docket **155-36**, page ENR 1.2-2, section 2.2).

Similarly, ICAO 4444 expressly excludes terrain separation as a duty owed by air traffic control to VFR flights. "The objectives of the air traffic control service as prescribed in Annex 11 do not include prevention of collision with

terrain. The procedures prescribed in this document do not relieve pilots of their responsibility to ensure that any clearances issued by air traffic control units are safe in this respect." (Docket **155-39**, section 5.9, page 5-40).

Ms. Harvey conceded at deposition that the documents which controlled Midwest ATC's actions placed the responsibility for terrain avoidance exclusively on VFR pilots.

"Q:    If there is a place in the documents that you believe shows that under visual flight rules, someone other than the pilot has ultimate and sole responsibility for separation from terrain, I'll give you all the time you need to find that?

A:    No. I agree there isn't anything. (Docket **155-23**, page 43, lines 18-24).

Ms. Harvey further conceded that the responsibility for terrain separation should never be assigned to an air traffic controller, because with "a pilot under VFR, you have to give them remit to fly their own aircraft. So a controller would never have [the prevention of controlled flight into terrain] put on them unless it's in the controlled airspace where VFRs are not permitted." (Docket **155-23**, page 54, lines 7-23).

In light of Ms. Harvey's concessions and the express language of the Afghanistan AIP and ICAO 4444, and for all of the reasons set forth above, the District Court correctly found that Midwest ATC's duties and responsibilities

under the controlling documents did not include a duty to provide terrain

separation services to VFR aircraft, and granted summary judgment to Midwest

ATC accordingly.

**C.      The actions of the TKU662 pilot constitute the sole proximate cause of
the accident.**

Although finding as a matter of law that no duty existed on the part of

Midwest ATC to provide terrain separation to TKU662, the District Court

nevertheless evaluated the question of proximate cause, and concluded that the

pilot "had the continuing duty to be aware of his location, of the elevation of

terrain over which he was flying, and of the danger posed by such terrain.  He was

negligent in not fulfilling these duties, and that negligence was the proximate and

sole cause of this tragic plane crash."  (Docket **170**, page 30, citing *McDaniel*,

*supra*, 553 F.Supp. at 916).

This conclusion was further supported by the Court's finding that the

controller had no reason to believe, from what was being conveyed to him by the

pilot and what he was able to observe, that TKU662 was in unsafe proximity to

terrain.  Given that the flight was at all times operating under visual flight rules, the

controller had the right to assume, absent evidence to the contrary, that the pilot

could see and avoid terrain.  (Docket **170**, pages 29-30).  The intervening

negligence of the pilot severed any arguable chain of causal connection between

the acts of the controller and the accident, making the pilot's negligence its sole proximate cause. (Docket **170**, page 29).

Plaintiffs argue, once again unsupported by the facts and the applicable law, that "the relationship of pilot and controller is a teamwork environment," to claim concurrent proximate causes of the accident. (Appellants' Brief, page 41). In addition, plaintiffs assert that "there is a dispute on responsibility for VFR flying." (Appellants' Brief, page 43).

While the relationship of pilot and controller may indeed be characterized as a teamwork environment under certain circumstances, the factual record and the applicable law belie the claim that there is a "dispute" over responsibility for VFR flying. There is no dispute. There is no concurrent or shared responsibility for VFR terrain separation. According to plaintiffs' own air traffic control expert, as well as all other fact witnesses and legal authorities, the VFR pilot has the "sole and exclusive responsibility to separate himself from terrain." (Docket **155-23**, page 117, lines 8-12).

Where only one party bears the duty to prevent the accident, it follows that that party's negligence constitutes the sole proximate cause of the accident. The District Court was correct in its finding. (Docket **170**, page 29, citing *Gray v. Wackenhut Services, Inc.*, 446 Fed. App'x 352, 354 (2d Cir. 2011)).

The grant of summary judgment to Midwest ATC was proper and should be affirmed.

## Conclusion

Defendant-appellee Midwest Air Traffic Control Service, Inc., respectfully requests that this Court affirm in all respects the District Court order granting summary judgment and dismissing this action in the entirety.

*s/ John P. Freedenberg*
John P. Freedenberg
Kenneth L. Bostick, Jr.
GOLDBERG SEGALLA LLP
665 Main Street
Buffalo, New York 14203
(716) 566-5400
jfreedenberg@goldbergsegalla.com

Counsel for Defendant-Appellee
Midwest Air Traffic Control Service, Inc.

## Certificate of Compliance

1.     This principal brief on behalf of defendant-appellee complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) in that it contains fewer than 10,000 words (approximately 9,481 words in total).

2.     This brief further complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type styles requirements of Fed. R. App. P. 32(a)(6) in that it has been prepared in a proportionally spaced typeface using Microsoft Word Office 2016 in Times New Roman at 14 point.

*s/ John P. Freedenberg*
John P. Freedenberg

Counsel for Defendant-Appellee

**Certificate of Service**

I hereby certify that on the 30th day of July, 2020, the above Brief was electronically filed and served via the Court's CM/ECF System on:

Thomas P. Routh, Esq.
Michael S. McArdle, Esq.
NOLAN LAW GROUP
20 North Clark Street
30th Floor
Chicago, Illinois 60602
312-630-4000
tpr@nolan-law.com

*/s/John P. Freedenberg*
John P. Freedenberg, Esq.

*Attorneys for Defendant-Appellee*